**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| SMMHC Inc., d/b/a Mountain Health & Wellness,<br><br>                    Plaintiff,<br><br>v.<br><br>Aprima Medical Software, Inc.,<br><br>                    Defendant. | No. CV-13-02160-PHX-NVW<br><br>**ORDER** |

Before the Court is Defendant Aprima Medical Software, Inc.'s Motion to Abate, or in the Alternative, Motion to Dismiss or Transfer (Doc. 9), the Response (Doc. 14), and the Reply (Doc. 15).  The Motion also seeks to compel arbitration of Plaintiff's claims.  For the following reasons, the Motion (Doc. 9) will be denied, except that the parties will be required to submit their disputes in this action to arbitration in accordance with the terms of their agreement.

## I.    FACTS

In December 2010, Plaintiff SMMHC, Inc., d/b/a Mountain Health & Wellness entered into a Software License Agreement ("License Agreement") with Aprima Medical Software, Inc., to license Aprima's Patient Relationship Manager ("PRM") software for Mountain Health's behavioral healthcare services.  Although the Patient Relationship Manager was primarily used by general medicine providers, the parties believed the program could also be useful for a behavioral health provider.  The License Agreement

provided for installation, training, and maintenance of software that streamlined patient management by performing functions related to "charting, coding, billing and documentation." (Doc. 9, Exh. A-1 at p. 1). The arbitration clause contained within the License Agreement provides, "Any controversy or claim arising out of or relating to the contract, or breach thereof, shall be finally settled by binding arbitration administered by the American Arbitration Administration . . . ."

On June 17, 2011, the parties entered into a new agreement, the Final Development Agreement ("Development Agreement"), wherein Aprima contracted to work with Mountain Health to develop enhancements to its "PRM2011" software product that would serve the needs of behavioral health practices. (Doc. 9, Exh. A-3 at p. 1). Mountain Health wanted the software enhancements to generate the specific records, reports, coding, billing, and receivables required for Mountain Heath to be reimbursed by its third party payers. Mountain Health continued licensing the Patient Relationship Manager software under the License Agreement after the Development Agreement was executed.

The Development Agreement provided that Mountain Health would pay $250,000 during the development period and an additional $50,000 upon acceptance of the product. (Doc. 9, Exh. A-3 at p. 1). Aprima would maintain ownership of the final work product but, for a period of five years from the date of acceptance, Aprima would pay Mountain Health "a 25% commission on any net software license fees generated from future behavioral health customers sold and installed in Arizona and 12.5% commission for net software licenses fees generated from future behavioral health customers elsewhere in the United States." (Doc. 9, Exh. A-3 at p. 2). The Development Agreement does not contain an arbitration clause and does not mention, refer to, or in any way incorporate the terms of the License Agreement.

Over the next two years, the parties' working relationship unraveled. On July 1, 2013, Mountain Health mailed a demand letter and draft complaint to Aprima. The demand and draft complaint asserted claims for breach of contract under the

Development Agreement (but none under the License Agreement), and under the Texas Deceptive Trade Practices Act. A consumer seeking damages under the Deceptive Trade Practices Act must give written notice sixty days in advance of filing suit. Tex. Bus. & Com. Code Ann. § 17.505. The notice must include the nature of the complaint and projected damages. *Id*.

Aprima's counsel responded by requesting a time to discuss the dispute in August 2013. Because Mountain Health's counsel was on vacation, a call could not be set until September 4, 2013. In that call, Aprima offered to draft a position statement outlining its understanding of the facts surrounding the dispute. The parties then set another call for September 17, 2013, to discuss Aprima's position. Aprima sent its position statement to Mountain Health on September 9, 2013.

The second call took place as agreed at 11:00 a.m., September 17, 2013. Mountain Health disagreed with Aprima's position statement but presented Aprima with a proposed settlement amount. Aprima's counsel said he did not believe the company could or would settle for the proposed amount but advised Mountain Health that he would present the demand, since up to that point in time, Aprima had not considered any specific amount. The meeting ended, and a few hours later Aprima filed with the American Arbitration Association in Dallas, Texas, a demand for arbitration of claims under the License Agreement, though Mountain Health had made no claims under the License Agreement. At the same time, it also filed a complaint in the United States District Court for the Northern District of Texas to compel arbitration of Mountain Health's claims under the Development Agreement or, in the alternative, for declaratory judgment that Aprima has no liability on those claims. Aprima contends that the arbitration provision in the License Agreement encompasses the claims under the later Development Agreement.

The next day, September 18, Aprima notified Mountain Health that it rejected the settlement offer and had already filed suit the day before. Mountain Health then filed this action on its claims under the Development Agreement that same day, September 18,

1    2013, one day after Aprima had filed its Texas case.  Mountain Health unsuccessfully

2    challenged personal jurisdiction in the Northern District of Texas.  Aprima's Motion

3    seeks to abate or dismiss Mountain Health's action in this Court, or in the alternative, to

4    transfer it to the Northern District of Texas.  (Doc. 9.)  Aprima also moves to compel

5    arbitration of Mountain Health's claims under the Development Agreement, the claims

6    asserted in this action.

7    **II.      MOTION TO TRANSFER VENUE UNDER 28 U.S.C. § 1404**

8            Aprima argues this case should be transferred to the Northern District of Texas.

9    The federal venue statute provides, "For the convenience of parties and witnesses, in the

10   interest of justice, a district court may transfer any civil action to any other district or

11   division where it might have been brought. . . ."  28 U.S.C. § 1404(a).  On a motion to

12   transfer venue, "a court must balance the preference accorded plaintiff's choice of forum

13   with the burden of litigating in an inconvenient forum.  The defendant must make a

14   strong showing of inconvenience to warrant upsetting the plaintiff's choice of forum."

15   *Decker Coal Co. v. Commonwealth Edison Co.*, 805 F.2d 834, 843 (9th Cir. 1986).

16   Private factors are considered, such as "'relative ease of access to sources of proof;

17   availability of compulsory process for attendance of unwilling, and the cost of obtaining

18   attendance of willing, witnesses; . . . and all other practical problems that make trial of a

19   case easy, expeditious and inexpensive.'"  *Id.* (quoting *Gulf Oil Corp. v. Gilbert*,

20   330 U.S. 501, 508 (1947) (discussing *forum non conveniens*)).  Public factors are also

21   weighed, such as "'the administrative difficulties flowing from court congestion; the local

22   interest in having localized controversies decided at home; the interest in having the trial

23   of a diversity case in a forum that is at home with the law that must govern the action; the

24   avoidance of unnecessary problems in conflict of laws, or in the application of foreign

25   law; and the unfairness of burdening citizens in an unrelated forum with jury duty.'"  *Id*.

26   (quoting *Piper Aircraft v. Reyno*, 454 U.S. 235, 241 n.6 (1981)).

27           Aprima argues that because it is based in Texas, manages only a small sales force

28   in Arizona, and has many of its key witnesses in Texas, the balance of convenience

- 4 -

weighs heavily in its favor.  These factors do not sharply favor Aprima, or favor it at all.  Mountain Health is an Arizona corporation that does business only in Arizona.  All of its witnesses reside in Arizona, and some of Aprima's witnesses are in Arizona.  Mountain Health's only connection with Texas is the software it commissioned from Aprima and a trip made by some employees to be trained by Aprima.  The contract was to write software specifically for Mountain Health's use in Arizona.  If breached, it was breached in Arizona.  These private factors favor Mountain Health, not Aprima.

The public considerations do not favor Aprima.  Statistical averages of case times in the District of Arizona and the Northern District of Texas do not differ significantly and are less important than data for the specific division of each court.  Litigation in this Court will not delay anyone.  The undersigned judge concludes 89.5% of civil cases within twelve months of filing.  Arizona's interest in adjudicating claims against persons doing business with Arizona residents in Arizona is stronger, not weaker, than Texas's interest in providing a local forum against out-of-state customers.  The parties could have contracted for an exclusive venue but did not.  The Development Contract has a Texas choice of law provision, but there is no suggestion that relevant Texas contract law differs from Arizona law or contract law generally or that any difference would present any difficulty.  Weighing the factors, it is clear that a transfer to Texas would not reduce inconvenience, but shift it and to some extent increase it.  Aprima falls far short of overcoming Mountain Health's choice of forum.  Indeed, the balance of considerations strongly favors resolution of this dispute in Arizona.  Aprima's Motion to transfer this action to the Northern District of Texas will be denied.

**III.   MOTION TO ABATE**

Aprima also argues this action should be abated in favor of the action it filed in the Northern District of Texas because it filed its action first.  Mountain Health counters that Aprima only filed first by bad faith means and Arizona is the more appropriate forum in any event.  Both cases involve the same parties and the same claims.

/ / /

1    When cases involving the same parties and issues are filed in different federal
2 courts, the "first to file" rule gives the second district court the "discretion to transfer,
3 stay, or dismiss the second case in the interest of efficiency and judicial economy."
4 *Cedars-Sinai Med. Center v. Shalala*, 125 F.3d 765, 769 (9th Cir. 1997). The first to file
5 rule "is not a rigid or inflexible rule to be mechanically applied, but rather is to be applied
6 with a view to the dictates of sound judicial administration." *Id.* Bad faith or forum
7 shopping strips the first-filed case of its usual priority. *Alltrade, Inc. v. Uniweld Prods.,*
8 *Inc.*, 946 F.2d 622, 628 (9th Cir. 1991).

9    Aprima got a one-day jump on Mountain Health's Arizona action only by
10 requesting negotiation for two and a half months after receiving Mountain Health's draft
11 complaint. Aprima's bad faith is apparent in filing suit before ending the negotiation it
12 requested. Aprima's contention that, though Mountain Health had to wait 60 days to sue
13 under the Texas Deceptive Trade Practices Act, Aprima could sue any time, does not
14 override its disingenuous act of not disclosing its plan to sue first while engaging in
15 negotiations. Mountain Health could have sued immediately on its Development
16 Agreement claims and amended 60 days later to add the Deceptive Trade Practices Act
17 claims. Aprima's contention also breaks faith with the purpose of the Deceptive Trade
18 Practices Act's notice period to discourage litigation and encourage settlement. It is not
19 an opportunity to forum shop before the plaintiff can file suit. *Richardson v. Foster &*
20 *Sear, L.L.P.*, 257 S.W.3d 782, 784 (Tex. App. 2008). By the time Mountain Health
21 presented its settlement offer, the Deceptive Trade Practices Act's 60 day notice period
22 had run. But Aprima continued to engage in settlement talks and asked for time to
23 respond to the settlement offer, when it only wanted time to drive to court. If Aprima had
24 substituted candor for disingenuousness, Mountain Health's complaint of July 1, 2013,
25 could have been filed any time in the preceding two and a half months and would have
26 been filed first.
27 / / /
28 / / /

- 6 -

1    The rule of thumb of first to file carries little weight when one party beats another

2    by filing in bad faith or for forum shopping.  *See, e.g.*, *Inherent.com v. Martindale-*

3    *Hubbell*, 420 F. Supp. 2d 1093, 1099-1100 (N.D. Ca. 2006) (holding the first to file rule

4    did not apply when the defendant had preemptively filed suit in another jurisdiction

5    instead of responding to the plaintiff's settlement offer).  Moreover, the reasons discussed

6    for not transferring venue also count against the request to abate.  Arizona is the more

7    appropriate forum for this case, and Aprima's motion to abate will be denied.

8    **IV.    MOTION TO COMPEL ARBITRATION**

9    Aprima further moves to compel arbitration of the claims in this case under the

10   Federal Arbitration Act.  (It also calls this dismissal for improper venue pursuant to

11   Federal Rule of Civil Procedure 12(b)(3), but venue is plainly proper here.

12   28 U.S.C. § 1391(b)(2)).   Though Mountain Health has asserted no claims under the

13   License Agreement, Aprima commenced arbitration in Texas on the License Agreement.

14   That arbitration proceeding is not involved in this motion to compel arbitration.  Here,

15   Aprima asserts that the License Agreement and Development Agreement are so

16   interrelated that the binding arbitration clause contained in the License Agreement covers

17   disputes arising out of the Development Agreement.  Mountain Health counters that the

18   Development Agreement contains no arbitration clause, and the parties are not required

19   to arbitrate any disputes arising out of it.

20   Aprima argues the License Agreement's arbitration clause is broad enough to

21   reach the Development Agreement because it covers "[a]ny controversy or claim arising

22   out of or relating to" the License Agreement.  (Doc. 9, Exh. A-1 at 5, ¶ 21).  Although

23   arbitration is favored by federal law, the parties must agree to it.  *AT&T Tech., Inc. v.*

24   *Comm'n. Workers*, 475 U.S. 643, 648 (1986); *see* 9 U.S.C. § 3.  "Determining whether

25   the parties agreed to arbitrate the dispute in question involves two considerations:

26   (1) whether a valid agreement to arbitrate between the parties exists; and (2) whether the

27   dispute in question falls within the scope of the arbitration agreement."  *Pennzoil*

28   *Exploration & Prod. Co. v. Ramco Energy Ltd.*, 139 F.3d 1061, 1065 (5th Cir. 1998).

1    The question of whether parties agreed to arbitrate a matter is decided by applying the

2    relevant state law principles that govern the interpretation of contracts.  *First Options of*

3    *Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995).

4           Mountain Health admits the License Agreement's arbitration clause is valid and

5    applies to disputes over the License Agreement.  It only challenges whether disputes

6    arising under the Development Agreement fall within its scope.  Arbitration clauses

7    encompassing disputes "arising out of or relating to" a contract are considered broad.  *See*

8    *Prima Paint Corp. v. Flood & Conklin Mfg. Co.,* 388 U.S. 395, 397-98 (1967) (holding

9    that a clause requiring arbitration of "[a]ny controversy or claim arising out of or relating

10   to this Agreement" was "broad").  They generally "embrace all disputes between the

11   parties having a significant relationship to the contract regardless of the label attached to

12   the dispute."  *Pennzoil Exploration & Prod. Co.*, 139 F.3d at 1067.  Close scrutiny of the

13   content and context of both contracts is needed to determine whether disputes that "arise

14   out of or relate to" one contract covers disputes under a separate and later contract.  The

15   following factors suggest an arbitration clause in one contract also governs another

16   contract:

17   • If "the legal claim underlying the dispute could not be maintained without

18   reference to the contract" containing the arbitration clause.  *Tittle v. Enron Corp.*, 463

19   F.3d 410, 422 (5th Cir. 2006).

20   • If both contracts "cover the same subject matter and are integrally related."

21   *David L. Threlkeld & Co., Inc. v. Metallgesellschaft Ltd. (London)*, 923 F.2d 245, 252

22   (2d Cir. 1991) (finding that an agreement to value forward contracts arose out of or

23   related to an agreement to purchase and sell forward contracts and was subject to the

24   purchase and sell agreement's arbitration clause).

25   • If the contract with the arbitration clause explicitly supersedes all prior agreements

26   in an ongoing relationship between parties.  *See Pennzoil Exploration & Prod. Co.*,

27   139 F.3d at 1067-69 (5th Cir. 1998) (holding that an earlier agreement was subject to

28   arbitration under a later-executed agreement's arbitration clause because the later

agreement, although not addressing the exact issues of the earlier agreement, expressly superseded all prior arrangements between the parties)

- If the two contracts are simultaneously executed.  *See Kirby Highland Lakes Surgery Ctr., L.L.P. v. Kirby*, 183 S.W.3d 891, 894 (Tex. App. 2006) (holding that the parties must arbitrate a dispute over a Purchase and Sale Agreement when the parties' "Partnership Agreement contains a broad arbitration clause extending to disputes 'related to' that agreement; that agreement and the Purchase and Sale Agreement were executed at the same time as parts of a single transaction; and the Partnership Agreement was essential to the overall transaction").

- If one contract anticipates the execution of the other.  *See Personal Sec. & Safety Sys. Inc. v. Motorola, Inc*, 297 F.3d 388, 393 (5th Cir. 2002) (finding that although two agreements governed different facets of the parties' relationship, because they represented key elements of the parties' relationship and each contract anticipated the execution of the other, one contract was subject to arbitration under the other contract's arbitration clause).

- If the relationship between the contracts is "clear and direct."  *Pervel Indus., Inc. v. T M Wallcovering, Inc.*, 871 F.2d 7, 9 (2d Cir. 1989) (holding that when a contract for purchase and sale of item led to an exclusive distribution contract, the "relationship between the contract of purchase and the exclusive distributorship which it created [was] clear and direct," meaning the arbitration clause in the purchase and sale contract also applied to disputes under the distributorship contract).

In contrast, the following factors suggest a dispute over a separate contract does not "arise out of or relate to" a different contract with an arbitration clause:

- If the suit could be maintained without reference to the contract containing the arbitration clause.  *See Dr. Kenneth Ford v. NYLCare Health Plans of Gulf Coast, Inc.*, 141 F.3d 243, 251-52 (5th Cir. 1998) (holding a physician was not required to arbitrate a false advertising suit against his health maintenance organization when none of the elements of the false advertising suit depended on the agreement between them).

- If both contracts relate to the same general line of business, but it is clear that the contract without the arbitration clause is separate and distinct from the first. *See Necchi S.p.A. v. Necchi Sewing Machine Sales Corp.*, 348 F.2d 693, 698 (2d Cir. 1965) 383 U.S. 909 (1966) (finding that an earlier licensing agreement remained "distinct and separate" from the subsequent distribution contract containing an arbitration clause).

- If the parties assume roles so distinct in each contract that the claims asserted against a party in a role assumed under one contract do not bear a significant relationship to the role assumed in the other contract. *Wachovia Bank, Nat. Ass'n v. Schmidt*, 445 F.3d 762, 767-78 (4th Cir. 2006) (holding that a dispute arising from a financial advisement agreement with a bank was not related to a loan agreement with the same bank, even though the loan money was invested by the financial adviser).

Some of the factors cut against compelled arbitration in this case.  The purpose of the License Agreement was to provide Mountain Health with ready-made software to streamline "charting, coding, billing and documentation" in its behavioral health practice. (Doc. 9, Exh. A-1 at 1).  After using the software for a period of time, Mountain Health concluded that, in its current state, the software could not handle all of Mountain Health's billing and documenting needs.  Aprima knew of no product on the market that could meet Mountain Health's exact needs, so it was decided the parties would work together to develop add-ons that would allow the software to better serve behavioral health practitioners.  To that end, the parties entered into the Development Agreement to jointly develop "enhancements" to the software.

In the Development Agreement the parties took on a new relationship with obligations distinct from those imposed by the License Agreement.  Under the License Agreement, Aprima was to provide stock software, along with the attendant training and technical support.  Under the Development Agreement, Aprima was required to develop new pieces of the software, work with Mountain Health to perfect them, and eventually share the profits from the sale of the new behavioral software package.  In this action,

1    Mountain Health is suing Aprima for failing to uphold its obligations as a developer,

2    obligations which were separate and distinct from Aprima's obligations as a licensor.

3         The Development Agreement, however, is closely related to the License

4    Agreement.  It contemplates developing add-ons to the software licensed under that

5    Agreement and arises out of the same general relationship between the parties.  It states

6    that Mountain Health "will serve as a release candidate for the version of Aprima that

7    includes Behavioral Health . . . ."  (*Id*. at 2).  The enhancements created under the

8    Development Agreement could not have been used without a license to Aprima's basic

9    medical records software, making it impossible for Mountain Health to work on the

10   enhancements without operating under the License Agreement.

11        The Development Agreement also lacks the typical clauses of a stand-alone

12   contract.  It is only two pages and covers only the type of enhancements, development

13   schedule, amount to be paid, and royalties on future sales.  (Doc. 9, Exh. A-3).  A natural

14   reading of the short agreement is that it was meant to supplement the License Agreement.

15   This favors granting arbitration.  *See David L. Threlkeld & Co., Inc.*, 923 F.2d at 252

16   (holding that an arbitration clause in one contract encompasses a subsequently executed

17   contract when the contracts "cover the same subject matter and are integrally related").

18        Moreover, Mountain Health's Complaint alleges that "Aprima falsely represented

19   to [Mountain Health] that Aprima's medical software, with its behavioral health

20   enhancements, would meet [Mountain Health]'s contract requirements in accordance

21   with the attachments to the Development Agreement."  (Doc. 1, ¶ 39).  Mountain

22   Health's goal in entering into the Development Agreement was to develop a product that,

23   when combined with the License Agreement software, would meet its business goals.

24   The two contracts are related.  Although the case presents a close question, the factors tip

25   toward the conclusion that the parties' dispute over the Development Agreement "arises

26   out of or relates to" the License Agreement.  In determining whether a dispute must be

27   arbitrated, "due regard must be given to the federal policy favoring arbitration, and

28   ambiguities as to the scope of the arbitration clause itself resolved in favor of arbitration."

1    *Volt Info. Sciences, Inc. v. Bd. of Trustees of Leland Stanford Junior Univ.,* 489 U.S. 468,

2    475-76 (1989).

3            **B.      Final Appealable Order**

4            Since this is a close question, the Court will give the parties an immediate right to

5    appeal by entering a final judgment compelling arbitration and dismissing this action

6    without prejudice.  9 U.S.C. § 16(a)(3) (permitting an appeal from "a final decision with

7    respect to an arbitration"); *see Green Tree Financial Corp.-Ala. v. Randolph*, 531 U.S.

8    79, 86-89 (2000) (holding that an order directing arbitration and dismissing all claims

9    was a "final decision with respect to an arbitration within the meaning of

10   9 U.S.C. § 16(a)(3), and an appeal may be taken").

11           IT IS THEREFORE ORDERED that Defendant Aprima Medical Software, Inc.'s

12   Motion to Abate, or in the Alternative, Motion to Dismiss or Transfer (Doc. 9) is denied,

13   except that the parties will be required to arbitrate their dispute.

14           IT IS FURTHER ORDERED that the Clerk shall enter judgment (1) ordering

15   Defendant Aprima Medical Software, Inc., and Plaintiff SMMHC, Inc., d/b/a Mountain

16   Health & Wellness to arbitrate the disputes raised in this action in accordance with the

17   terms of the License Agreement (Doc. 9, Exh. A-1 at 5, ¶ 21), and (2) dismissing this

18   action without prejudice.  The Clerk shall terminate this case.

19           Dated this 14th day of March, 2014.

20

21

22   _____

23                          Neil V. Wake
                    United States District Judge

24

25

26

27

28